

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JEFFREY M. TERRY, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | Docket No. 06-1788 (JAG) |
| | § | |
| | § | |
| TOWN OF MORRISTOWN and, | § | |
| KARL PETER DEMNITZ, Individually | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |
| | § | |

## PLAINTIFF JEFFREY M. TERRY'S BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*On the Brief:*

PETER J. CRESCI, ESQ.
CRESCI LLC
PO BOX 74, 830 Avenue A
Bayonne, New Jersey 07002
(201) 436-4126
Attorneys for Plaintiff, J. Terry

Peter J. Cresci, Esq. (PC7693)
CRESCI LAW FIRM LLC
PO Box 74, 830 Avenue A
Bayonne, New Jersey 07002-0074
(201) 436-4126 Tel.
Attorney for the Plaintiff


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JEFFREY M. TERRY, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | Civil Action No. 06-1788 (JAG) |
| V. | § | |
| | § | |
| | § | |
| TOWN OF MORRISTOWN and, | § | |
| KARL PETER DEMNITZ, Individually | § | |
| | § | |
| **Defendants.** | § | |
| | § | |


### PLAINTIFF'S STATEMENT OF FACTS IAW Local R.56.1


1. Jeffrey Terry applied for the position of Police Officer for Morristown and was the *de facto* #1 candidate on the eligibility list OL042039, certified date November 10, 2004 when the original first candidate, Tyler Rago, opted out of being appointed to Morristown Police Department; there were four vacancies (Pl.Ex E & Pl.Ex. F). Mr. Terry passed the examination, background investigation, physical fitness, and interview process (PL.Ex.I).

2. Defendant Karl Peter Demnitz is the Chief of Police (Pl.Ex.Q, 23:15-23)

1

3. Plaintiff was a successful candidate for a Town of Morristown police officer position in 2002, and passed the psychological examination. Police Chief Carol Williams wanted Plaintiff to grow professionally and instead offered Plaintiff a Communications Officer position (Pl.Ex.D, as well as Bobbi Stanton's testimony (PL.Ex. V, 19:11-23).

4. Plaintiff did pass a second psychological examination prior to being hired as a Police Officer; see Dr. Bart Rossi's psychological report from December 28, 2004 evaluation (PL.Ex.N)

5. Plaintiff Terry was conditionally offered the position pending a psychological examination on December 17, 2004 (Pl. Ex. I).

6. Plaintiff was interviewed by the panel and passed his background investigation as stated in the letter from Chief Demnitz dated December 17, 2004, **"Based on your background investigation and your performance before the interview panel on December 14, you are eligible to be offered employment on a provisional basis with Morristown Bureau of Police"** (Pl.Ex.I). This is in direct contravention to Defendant's #6. A genuine issue of material fact exists.

7. No member of the [interview] panel were concerned with Plaintiff. This is demonstrated in that the letter of December 17, 2004 states, ". . .and your performance before the interview panel on December 14, 2004, you are eligible to be offered employment . . ." (PL.Ex.I) Defendant's counsel is confusing the court with the June 28th 2004 interview panel documentation (Pl.Ex.J) which Defendant Demnitz faxed to IFP. This is in direct contravention to Defendant's #7. A genuine issue of material fact exists.

8. After the December 14, 2004 interview Chief Demnitz did not request a written recommendation from any of the panel members because Plaintiff had performed well in the interview (PL.Ex. I). This is another contradiction and genuine issue of material fact.

2

9. No panel members declined to recommend Plaintiff for the position as Police Officer in the December 14, 2004 selection process. Defendant is again attempting to use the June 28, 2004 interview panel for the December 2004 selection process in which Plaintiff passed the interview panel (PL.Ex.I).

10. As in #9, No panel members declined to recommend Plaintiff for the position as Police Officer in the December 14, 2004 selection process. Defendant is again attempting to use the June 28, 2004 interview panel for the December 2004 selection process in which Plaintiff passed the interview panel (PL.Ex.I).

11. Plaintiff received a conditional offer of employment pending the passing of a physical and psychological screen (PL.Ex. I) dated December 17, 2004.

12. Plaintiff did indeed pass a psychological screen, or fit for duty, as set forth by Dr. Bart Rossi, PhD on December 28, 2004, with a report dated January On December 28, 2004 Plaintiff went to Dr. Bart Rossi, PhD. Dr. Rossi rendered a report dated January 3, 2005 that Plaintiff was psychologically fit for duty to become a police officer (Pl.Ex. N). Plaintiff Jeff Terry, passed an independent psychological evaluation by an appropriately licensed psychologist, who is also a *Diplomat* in the profession. The licensed psychologist, Dr. Bart Rossi, approved Appellant as eligible for a police officer position, citing the lack of Appellant's background problems, an excellent work history in recent years, and scores on the MMPI-2 that are within "normal limits," as well as a relatively high intelligence score, and good interpersonal skills. Dr. Bart Rossi's report dated January 3, 2005 (Pl.Ex N). This is in genuine conflict with Defendant's #12.

3

13. On December 21, 2004 at 4:34 PM (fax tag line), Defendant Demnitz sent fax to Institute of Forensic Psychology which consisted of derogatory information from June 28, 2004 interview panel (Pl.Ex.J). The inconsistency here is that Chief Demnitz had already stated, "[b]ased on your background investigation and your performance before the interview panel on December 14th you are eligible to be offered employment on a provisional basis with the Morristown Bureau of Police conditional upon successful completion of physical and psychological evaluations." (Pl.Ex.I)

14. Plaintiff went to IFP for his psychological background test on December 27, 2004. The final psychological report from Mathew Guller, dated January 10, 2005, sent to Morristown Police Chief Pete Demnitz, has the signature of Dr. Leslie Williams-who is perhaps a psychologist-but Dr. Williams never met Plaintiff nor was observing at any time while Mr. Terry was at the IFP (Pl.Ex. L). Mathew Guller was not a licensed psychologist and the State of New Jersey admonished him for practicing psychology without a license, dated January 18, 2006 (Pl.Ex.K). This is a genuine issue of material fact as Mathew Guller was not a licensed psychologist and Dr. Williams had no direct supervision over Mathew Guller (the owner's son).

15. Plaintiff Terry did indeed submit himself to a questionnaire as well as a face-to-face psychological evaluation but **not** in front of Dr. Guller-as Mathew Guller was not a licensed psychologist (Pl.Ex. K).

16. The psychological examination revealed a high school fight over a decade earlier which resulted in a one-day suspension (PL.Ex.P, 126:18 to 127:7). However, Captain Kruse and Officer Rispoli (both officers on the force) had been arrested for assault charges yet still were

4

brought on the police force (Pl.Ex.R 24:20 thru 25:7) and Pl.Ex. S, 33:19 thru 34:15). This is a genuine issue of material fact.

17. Plaintiff indeed was suspended from his job at Morristown Memorial Hospital ten (10) years prior in 1994 (Pl.Ex.P, 119:19-21; 120:2-5). Plaintiff had subsequently passed the psychological examination for Morristown Police Department in 2002 when Carol Williams was Chief (PL.Ex. D). Again, Captain Kruse and Officer Rispoli (both officers on the force) had been arrested for assault charges yet still were hired onto the police force (Pl.Ex.R 24:20 thru 25:7 and Pl.Ex. S, 33:19 thru 34:15). This is a genuine issue of material fact.

18. Plaintiff denies that he stole any items from a desk at Morristown Memorial Hospital while on a duty as a security guard. The accusation was never proven and Plaintiff never resigned (Pl.Ex. P, 68:16-25). This is another genuine issue of material fact.

19. Plaintiff was indeed a bouncer when he was in his late teens, early twenties (PL.Ex.P, 57:13 thru 58:19, 138:3-10). Defendant Karl Peter Demnitz, Police Chief was a bouncer and a doorman at drinking establishments, which apparently has had little or no impact on Defendant's Demnitz ability to perform his job function. (Pl.Ex.Q 14:19-25 and 15:1-8). This is another genuine issue of material fact.

20. Plaintiff denies that Plaintiff was involved in several incidents where police were dispatched to the establishments. Police were called due to disorderly patrons. The police arrival had nothing to do with Plaintiff's employment or actions (PL.Ex.P, 58:7-10).

21. Plaintiff pushed a patron out the door because the patron was not leaving the bar and the patron had assaulted a female patron (Pl.Ex.P, 53:1-22). Chief Demnitz testified that this scenario was a rumor. (Pl.Ex. Q, 83:1-23). Chief Demnitz himself had been a bouncer at "Society Hill" (Pl.Ex R, 34:11-25).

5

22. Plaintiff was not terminated from Palm Grill for not staying at his post. (Pl.Ex.P 72:10-25).

23. Plaintiff was not terminated from Jimmy's, he quit the position. (PL.Ex. P 70:10-73:13).

24. Mathew Guller was not a licensed psychologist and could not professionally render an opinion as to the psychological fitness of Jeffrey M. Terry (Pl.Ex.K-Letter of Admonishment from the State of New Jersey to Mathew Guller, an unlicensed psychologist).

25. Again, Mathew Guller was not a licensed psychologist and Plaintiff did not have to agree or disagree with this non-licensed psychologist. On December 28, 2004, Plaintiff went to a licensed psychologist, Dr. Bart Rossi, a diplomate in his profession, who found Plaintiff psychologically fit for duty as a police officer candidate (Pl.Ex. N). This is another genuine issue of material fact.

26. Plaintiff had already passed several psychological examinations for the police officer position, including the 2002 position when Chief Carol Williams was the selecting official (Pl.Ex.D). This examination was done at IFP (Institute of Forensic Psychology), the same outfit that Mathew Guller's father owns. This is another genuine issue of material fact.

27. Plaintiff was treated as though he was a person with a disability when Chief Demnitz did not extend the offer of employment and did not consider an accommodation to Plaintiff to be a Police Officer (Pl.Ex. Q, 122:9-13).

28. Plaintiff received what appears to be a first opinion by Dr. Bart Rossi on December 28, 2004 who found Plaintiff fit to be a police officer (PL.Ex.N; Pl.Ex.P 34:18-21).

29. Defendant Demnitz did not consider Dr. Bart Rossi's report because he thought that the report by Mathew Guller was going to be negative (Pl.Ex. Q). Little did Defendant Demnitz

6

know that Mathew Guller had not license to be performing such activity (Pl.Ex. K). This is another genuine issue of material fact.

30. Indeed Plaintiff filed an appeal to the merit systems board. Plaintiff could not comprehend how an unlicensed person could fail a police officer candidate (Pl.Ex P, 42:3-12).

31-34. The appeal was sent for a medical review panel which convened a hearing on October 21, 2005. The panel called for yet another psychological screen, this time by Dr. Kanen (Pl.Ex.O). Dr. Kanen's report (PL.Ex. O) merely mimicked the information from the unlicensed Mathew Guller report (PL.Ex. L). You have dueling psychological examinations between Dr. Rossi (PL.Ex. N) and Dr. Kanen (Pl.Ex. O). This is a genuine issue of material fact.

35. Defendant Attention Deficit Disorder diagnosis was when he was 10 years old in the 5th grade, 18 years prior to the evaluation by Dr. Kanen (Pl.Ex. O).

36. In opposition to Dr. Kanen finding a history of work performance problems, Dr. Rossi found Plaintiff's work history of his teenage years to be normal for part-time work (Pl.Ex. N). This is a genuine issue of material fact.

37. Dr. Rossi found Plaintiff to be "psychologically suitable to perform the duties as police officer" and recommended Plaintiff to serve as a police officer. (Pl.Ex. N). This is a genuine issue of material fact.

38. Plaintiff agrees that exceptions to Dr. Kanen's report (Pl.Ex.O) were taken as Dr. Kanen adopted portions of Mathew Guller's report wholecloth (Pl.Ex.L)

39. Dr. Kanen reviewed the reports of Dr. Rossi and Mathew Guller (Def.Ex.F,p.4). This makes Dr. Kanen's report not independent. This is a genuine issue of material fact.

7

40. The board may have noted Dr. Rossi failed the note Plaintiff's issue of aggression, but Plaintiff was never arrested for assault as Police Officer Briscoe (Pl.Ex S, 33-19 thru 34:15) and Captain John Kruse were arrested prior to their employment (Pl.Ex.R, 24:20 thru 25:7). This is a genuine issue of material fact.

41-42. Plaintiff concurs with the statements about Plaintiff appealing the Merit System Board's decision.

43-44. Plaintiff did indeed apply for various alternate program routes, including two (2) Essex County programs (Pl.Ex.P, 86:23-25; 88:6-10).

45. Plaintiff was told he would have to go to either Mathew Guller or Dr. Kanen for his psychological screen; as both were witnesses to this litigation-Plaintiff did indeed claim "conflict of interest." (Pl.Ex. P 89:10 thru 90:8).

46. Plaintiff did sue Mathew Guller and IFP for practicing psychology without a license (Def.Ex. H). An expert, John Stewart McGovern rendered a report which demonstrates the violations of the Practicing Psychological Licensing Act. (Pl.Ex. M).

47-49. Plaintiff agrees to these statements regarding the procedural history of the case against Guller and IFP.

50. The State of New Jersey Medical Review Panel decided to subject Plaintiff to yet another "independent psychological examination" per their recommendation. Dr. Robert Kanen was the psychologist chosen to administer the "independent psychological examination" (Pa336). Dr. Kanen administered the evaluation on January 7, 2006 (Pl.Ex.O) yet his results were not disclosed until February 24, 2006. (Pl.Ex. O), 14 months after Plaintiff was successfully interviewed for the position as police officer.

8

51.  Plaintiff has previously "passed" several psychological testing for positions as

Corrections Officer, NJ Department of Corrections; Communications Officer, Morristown Police

Department (Pl.Ex. D) Pa376,ln 1-2;Pa372).  Further, Plaintiff passed a psychological test to

become a Morristown Police Department officer when Carol Williams was Chief of the

Department (PL.Ex. D; Pl.Ex. V, 19:11-23).


52.  Defendant Demnitz's testified in his deposition that **he was** the "Selecting Official." He
made the final decision not to hire Jeff Terry (Pl.Ex. Q, 85:3-9).  Demnitz stated he had two
reasons for non-selecting Jeff Terry, one major and one minor.

> a). The major reason was: Jeff Terry worked as a bouncer in his previous
> employment.
>
> b). The minor reason was: Jeff Terry often rolls up his shirt sleeves to reveal his
> biceps.  Demnitz clarified that these were the reasons for his non-selection.
> (PL.Ex. Q, p.84:6-22 thru 85:13)


53.  Bobbi Stanton, Defendant Demnitz's Secretary, testified that Chief Demnitz faxed over
derogatory information to IFP from June 28, 2004 interview panel, particularly unlicensed
Mathew Guller (Pl.V, 16:13-25 thru 17:22.  The information was from a June 28, 2004 interview
panel, not the December 14, 2004 panel (Pl.Ex. J).  Then Chief Demnitz also called Mathew
Guller to insure Jeff Terry would fail the psychological examination (Pl.Ex. V, 21:20 thru
22:25).  Chief Demnitz did not do this for the other candidates. (PL.Ex. V, Id)

54.  Captain Kruse testified he thought Jeff Terry would be a very good Police Officer and
that he thought he might be judging Jeffrey Terry too harshly (Pl.Ex. R, 45:21 thru 46:13).  The
concern that Jeffrey Terry was aggressive was based on rumors (Pl.Ex. R, 64:7-15)

55.  Officer Briscoe testified it was common knowledge that Jeff Terry failed the
psychological examination at IFP.  It was discussed around the workplace (Pl.Ex.U, 42:15 thru
43:2)

9

56. Officers Rispoli & Captain Kruse testified that they had been arrested in assault related issues prior to joining the force. These issues of physical assault never disqualified these individuals (Pl.Ex. S, 33:19 thru 34:15 and Pl.Ex. R, 24:20 thru 25:7);

57. Defendant Chief Demnitz issued a gun permit to Jeff Terry on May 9, 2008 (Pl.Ex. Z). Chief Demnitz obviously was not concerned about Plaintiff endangering anyone.

58. Chief Peter Demnitz has never fired his weapon in 26 + years as an Officer for the Morristown Police Department, nor did any of the other officers deposed (Pl.Ex Q, 128:12-17);

59. Jeff Terry passed the very same psychological examination in 2002 at IFP when Chief Carol Williams was the police chief. Bobbi Stanton (Chief's Secretary) testified that Jeff Terry wasn't given a position in 2002, but offered the Communications Officer in an effort to allow Jeff Terry "to grow within the Police Department." Nothing occurred between 2002 and 2004 in which could be interpreted as "a psychological event" which would prevent Jeff Terry from becoming a Police Officer. (PL.Ex. V, 21:20 thru 22:25).

60. The following police officers failed a psychological screen, yet were brought onto the police force: Karl Peter Demnitz, Bruce Summers, Officer James Lonergan, John Elia (Pl.Ex. R, 42:14 thru 45:1).

10

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF MATERIAL FACTS ................................................................. 2

PROCEDURAL HISTORY .................................................................................... 3

ARGUMENT ........................................................................................................... 5

    I.     DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT.
          GENUINE ISSUES OF MATERIAL FACT EXIST ................................. 5

    II.    PLAINTIFF WAS WRONGFULLY DISCRIMINATED AGAINST
          AS A PERSON WITH A PERCEIVED DISABILITY. DEFENDANTS'
          ARTICULATED REASONS ARE NOT LEGITIMATE ......................... 7

    III.   STATUTORY PROVISIONS MANDATING THE BLANKET
          EXCLUSION FROM EMPLOYMENT OF ALL PERSONS WITH ANY
          "APPARENT MENTAL DISORDER" LISTED IN THE DSM AND NJAC
          4A:4-6.1(a)(3) ARE FACIALLY INVALID UNDER THE ADA .................. 14

          A.    THE BLANKET EXCLUSION IS NOT JOB-RELATED AND
                CONSISTENT WITH BUSINESS NECESSITY ....................... 16

          B.    THE BLANKET EXCLUSION CANNOT BE JUSTIFIED UNDER
                THE "DIRECT THREAT" PROVISION .................................... 21

    IV.   DEFAMATION ........................................................................................ 24

    V.    DEFENDANT DEMNITZ'S INDIVIDUAL LIABILITY
          UNDER THE NJLAD ............................................................................. 25

CONCLUSION ........................................................................................................ 26

## TABLE OF AUTHORITIES

**CASES**

*Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999)* ............................................................. *18*

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)* ........................................... *6,7*

*Andrews v. Ohio, 104 F.3d 803 (6th Cir. 1997)* ................................................................... *15*

*Andersen v. Exxon Co., 89 N.J. 483, 497 n.2* ........................................................................ *4*

*Bibbs v. Black, 778 F.2d 1318 at 1322* ................................................................................ *12*

*Bombrys v. City of Toledo, 849 F.Supp. 1210 (N.D. Ohio 1993)* ....................................... *17*

*Bragdon v. Abbott, 524 U.S. 624 (1998)* ........................................................................ *22,23*

*Brewer v. Quaker Oil Refining Corp., 72 F.3d 326, 331 (3d Cir.1995)* .............................. *26*

*Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)* ......................................................... *6,7*

*Chipollini v. Spencer Gifts, Inc. 814 F.2d 893,897 (3d Cir.1987)* ...................................... *8*

*Cicchetti v. Morris County Sheriff's Office, 947 A.2d 626, 645 (N.J. 2008)* .................. *25,26*

*EEOC v. Chrysler Corp., 917 F.Supp. 1164 (E.D. Mich. 1996)* ........................................ *17*

*EEOC v. County of Allegheny, 705 F.2d 679 (3rd Cir. 1983)* ...................................... *21, 27*

*Fuentes v. Perskie 32 F.3d 759, 763* ............................................................................... *4,26*

*Hall v. U.S. Postal Service, 857 F.2d 1073 (6th Cir. 1988)* ............................................... *23*

*Hammer v. Board of Education, 955 F.Supp. 921 (N.D. Ill. 1997)* ..................................... *17*

*Heise v. Genuine Parts Co., 900 F.Supp. 1137 (D. Minn. 1995)* ....................................... *17*

*Hendricks-Robinson v. Excel Corp., 154 F.3d 685 (7th Cir. 1998)* .................................... *19*

*Hutchinson v. United Parcel Service, 883 F.Supp. 379 (N.D. Iowa 1995)* ......................... *17*

*Kelly v. Bally's Grand Inc., 285 N.J.Super..422, 432 (App.Div. 1985)* ................................. *4*

*Krocka v. Bransfield, 969 F.Supp. 1073 (N.D. Ill. 1997)* ................................................... *17*

i

*Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61,68 (3d Cir.1996.... ... ... .... ....8

*Marino v. Industrial Crafting Co.,* 358 F.3d 241, 247 (3d Cir.2004).... ... ... ... ... ... ... ... ....7

*McDonnell Douglas Corp., v. Green,* 411 U.S. 792, 802-04 (1973)................................8

*Neitzke v. Williams,* 490 U.S. 319, 327 n.6, 109 S.Ct. 1827,1832 n.6 (1989)......................2

*Orr v. Wal-Mart Stores, Inc.,* 297 F.3d 720, 725.............................................,14

*Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir. 1981).............................20

*Printing Mart-Morristown v. Sharp Electronics,* 116 N.J. 739, 768 (1989)... ... ... ... ... ... ....24

*Reeves v. Sanderson Plumbing Products Inc.,* 120 S.Ct. 2097 (2000)...............................9

*Rizzo v. Children's World Learning Centers, Inc.,* 84 F.3d 758 (5th Cir. 1996)..........................24

Sarsycki v. United Parcel Service, Inc., 862 F.Supp. 336 (W.D. Okl. 1994).................................17

*School Board of Nassau County v. Arline,* 480 U.S. 273 (1987)............................... 4, 14-15,22,23

*Sempier v. Johnson & Higgins,* 45 F.3d 724,728 (3d Cir.1995)... ... ... ... ... ... ... ... ... ... ... ...8

*Shaner v. Synthes,* 204 F.3d 494, 503 (3dCir.2000)... ... ... ... ... ... ... ... ... ... ... ... ... ...8

*Spades v. City of Walnut Ridge, Arkansas,* 186 F.3d 897, 900 (8th Cir.1999)... ... ... ... ... ... ....10

*Suders v. Easton,* 325 F.3d 432,435 n.2 (3d Cir.2003)............................................,5

*Waldron v. SL Indus, Inc.,* 56 F.3d 491, 503 (3d Cir. 1995)... ... ... ... ... ... ... ... ... ... ... ...8

## FEDERAL STATUTES, REGULATIONS AND INTERPRETIVE GUIDANCE

Americans with Disabilities Act (ADA), 42 U.S.C. §§12101, *et seq.*..................................... passim

EEOC Title I Regulations and Interpretive Appendix (29 C.F.R. part 1630) ....................... passim

EEOC's Technical Assistance Manual on Title I of the ADA ............................................. passim

Rehabilitation Act of 1973 (29 U.S.C. §791, et seq.)..............................................passim

## LEGISLATIVE HISTORY

H.R. Rep. No. 485 part 2, 101st Cong., 2d Sess. (1990) (Labor Report) ................................ passim

H.R. Rep. No. 485 part 3, 101st Cong., 2d Sess. (1990) (Judiciary Report) .......................... passim

S. Rep. No. 116, 101st Cong., 1st Sess. (1989) (Senate Report)................................................ passim

H. Conf. Rep. No. 101-596, 101st Cong., 2d Sess. (1990), 1990 U.S.C.C.A.N. 593.....................18

## STATE STATUTES & CODES

N.J.A.C. 4A:4-6.1(a)(3) ...............................................................................................14

## MISCELLANEOUS

Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV")
American Psychiatric Association (Washington, D.C. 1994),................................................ passim

## PRELIMINARY STATEMENT

COMES NOW, Jeffrey M. Terry ("Terry"), Plaintiff in the above entitled lawsuit, and the undersigned attorney for the Plaintiff, and requests this court to deny Defendant's Motion for Summary Judgment. This is a non-selection of a police officer position for Town of Morristown. We note that Defendants have far exceeded the page number allowable for filing a brief, without leave from court. We ask the court to consider only that portion of the brief allowable under the rules.

The Plaintiff relies upon the *Plaintiff's Response to Defendants' Motion for Summary Judgment*, the supporting verified documents (*Index of Exhibits*), and *Plaintiff's Local Rule 56.1 Statement of Facts*.

There is a variation of the saying, "when the facts are not in your favor argue intricacies of the law in an attempt to obfuscate the lawsuit." This is a fiction the defendants present before the court. The entire premise of the Defendants' case is the non-selection as a Morristown Police Officer either did not rise to the level of actionable discrimination, the selection process was normal, or that despite the record of various discriminatory statements or acts-which are corroborated by independent witnesses and documents, the defendants were saving Plaintiff from the dangers of law enforcement.

The actions of Defendants were clear. Defendant Karl Peter Demnitz (hereinafter "Demnitz") claimed he alone was the selection official (Pl.Ex.Q, 84:6-22 thru 85:13). Defendant Demnitz made the decision that Plaintiff Terry would not become a police officer based on two factors, to wit: 1) because Plaintiff Terry liked to roll his sleeves up on his shirts; and 2). Because Plaintiff Terry had worked as a bouncer years before. (Pl. Ex.Q, Id.). These are hardly a BFOQ (bona-fide occupational qualification) for becoming a police officer. Moreover, Defendants continually attempt to obfuscate the

facts of this case by using interview panel statements from June 28, 2004, when the Plaintiff passed the December 14, 2004 interview panel as set forth in Demnitz's provisional offer of employment (Pl.Ex.I).

## STATEMENT OF MATERIAL FACTS

Plaintiff Terry shall rely on Plaintiff's *Statement of Material Facts* and the Verification of Exhibits by Peter J. Cresci, Esq., in support of Plaintiff Terry's response to defendants' motion for summary judgment, all of which are incorporated by reference. As Plaintiff is the non-moving party, each statement of material fact should be construed in the favor of Plaintiff.

## I. INTRODUCTION

A.      Specifically, plaintiff's claims arise against the Town of Morristown and Karl Peter Demnitz for non-selection of a police officer position under the Americans with Disabilities Act (42 U.S.C. §12101, et seq.), the Rehabilitation Act of 1973 (29 U.S.C. §791, et seq.), the New Jersey Law Against Discrimination (N.J.S.A. §10:5, el seq.), and other common law torts, including defamation (See Plaintiff's Ex. A, ¶¶ V.A thru D). Because plaintiff's claim involves a federal question, this court has jurisdiction to hear the suit. *See Neitzke v. Williams, 490 U.S. 319, 327 n.6, 109 S.Ct. 1827, 1832 n.6 (1989)*. The court has jurisdiction over Terry's complaint pursuant to 28 U.S.C. §1331 and 42 U.S.C. §2000e-5(f) (3). Venue is proper, as the events giving rise to her claims arose in this district and division, 28 U.S.C. §1391(b).

2

B.      Defendants filed the subject Motion for Summary Judgment on February 1, 2010.   The Defendant's Motion for Summary Judgment does not establish that Defendant is entitled to judgment as a matter of law. There are genuine issues of material fact, as the Defendant's brief both omits facts and misrepresents same.   There are essential elements of the Plaintiff's claim before this court.  Herein Plaintiff has proffered sufficient evidence to demonstrate genuine issues for trial. This Honorable Court should find for the Plaintiff and allow the complaint to resume prosecution to a trial before his peers.

## C. Procedural History.

Amended Complaint was filed August 14, 2007 (Docket No. 4).  Defendant served (Docket No. 6). Defendant filed a motion to dismiss on December 26, 2006 (Docket No. 12) which was subsequently denied on an Order for Motion for Reconsideration (Docket No. 22).  Answer to the Amended Complaint filed May 15, 2008 (Docket No. 28) (Pl. Ex.B).  Motion for Summary Judgment filed by Defendant dated February 1, 2010 (Docket No. 48).  Response to MSJ filed by Plaintiff March 15, 2010.

## D. Defendant essentially makes four (4) arguments; all of which <u>fail</u>:

i.  Defendants claim a legitimate business reason for the non-selection of the Plaintiff for a police officer position.  Defendants, however, do not include that their "articulated legitimate reason for their actions" are pretext.  For instance, Defendant does not include, as discussed *infra*: (1) Defendant Police Chief Karl Peter Demnitz alone made the decision to not select plaintiff (Pl.Ex.Q,85:3-9).  The two reasons Defendant Demnitz did not select Plaintiff Terry as a police officer is because he liked to "roll his sleeves up," and he once worked as a bouncer (Pl.Ex Q, 84:6-22 thru 85:13).  These are

3

hardly BFOQs for becoming a police officer.  Defendants leave out the fact that Plaintiff
Terry had passed the psychological testing performed in 2002 for the same position
(Pl.Ex.D), and by Dr.Bart Rossi on December 28, 2004(Pl.Ex. N), and that previously
Plaintiff had passed a psychological screen to become a police officer for the Town of
Morristown when Chief Carol Williams was in control (Pl.Ex.V, 21:20 thru 22:25).

     2.  Plaintiff casts serious doubt on the veracity of the employer's legitimate, non-
discriminatory reasons so as to allow a jury to reasonably conclude the employer was
motivated to act for the discriminatory reason alleged. *Fuentes v. Perskie 32 F.3d 759,
763, and Kelly v. Bally's Grand Inc., 285 N.J.Super.,422, 432 (App.Div. 1985).*
Foremost, 1). Demnitz as selecting official relied on a psychological report from an
unlicensed psychologist, Mathew Guller (Pl.Ex. K, Pl.Ex.L) knowing there was a
legitimate psychologist's report in the form of Dr. Bart Rossi's report of December 28,
2004 (Pl.Ex.N); 2). Demnitz faxed derogatory information to Guller's firm IFP consisting
of select interview panel member's notes from a June 28, 2004 interview panel (Pl.ExJ),
not the December 14, 2004 panel for which Plaintiff succeeded (Pl.Ex.I); 3).  Demnitz
also called IFP's Mathew Guller to direct the result of the examination prior to the
examination of Plaintiff (Pl.Ex.V, 21:20-25 thru 22:1-23); 4) Defendant's rely now on a
January 7, 2006 report from Dr. Kanen, which was twelve months subsequent to
Plaintiff's non-selection (Pl.Ex. O).

     3.  **Plaintiff was Perceived as Disabled within the meaning of the law.**  In an
awkward twist, Defendant now wants to deny that they perceived the Plaintiff has having
a disability (Def. Brief, p.19, et seq.).  Defendant denied Plaintiff employment based on
the fact they relied on an unlicensed Mathew Guller psychologist's report (Pl.Ex. L).
When that report was thrown out by the state agency, Dr. Kanen's report (Pl.Ex.O) was
utilized to sustain the non-selection. Each report states that Plaintiff was psychologically
unfit to be a police officer.  As we discuss *infra*, where an employer has detrmined that
the plaintiff's condition was serious enough to deny him employment-you have met the
"perceived disability doctrine." *Andersen v. Exxon Co., 89 N.J. 483, 497 n.2; see also
School Board of Nassau County v. Arline, 480 U.S. 273, 283 (1987) under Rehabilitation*

*Act.* This case is one of dueling psychological reports, i.e. Rossi's December 28, 2004 report approving Plaintiff (Pl.Ex. N), and Kanen's January 6, 2006 report disqualifying Plaintiff (PL.Ex.O).

4. Defendant's argument that Plaintiff cannot refute the articulated legitimate reasons for the decision to not select the Plaintiff is a non-starter (Def Brief p.19-25) Defendant Demnitz's testified in his deposition that **he was** the "Selecting Official." He made the final decision not to hire Jeff Terry (Pl.Ex. Q, 85:3-9).  Demnitz stated he had two reasons for non-selecting Jeff Terry, one major and one minor.

    a). The major reason was: Jeff Terry worked as a bouncer in his previous employment.

    b). The minor reason was: Jeff Terry often rolls up his shirt sleeves to reveal his biceps. Demnitz clarified that these were the reasons for his non-selection. (PL.Ex. Q, p.84:6-22 thru 85:13) (Pl.Statement of Facts¶52)

The crux of this case focuses on the intent and acts of the Defendants.  In determining  whether genuine issues of material facts exist, the court should resolve all factual doubts in favor of the nonmoving party.  *Suders v. Easton, 325 F.3d 432,435 n.2 (3d Cir.2003).*

## II. LEGAL ARGUMENT

### POINT I

### DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT. GENUINE ISSUES OF MATERIAL FACT EXIST

**A. Genuine Issues of Material Fact Exist.**

Summary judgment is not proper in a case, as here, where genuine issues of material fact exist. *See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).* A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact. *Celotex, 477 U.S. at 323.* Summary judgment is improper in this case because there are genuine issues as to all material facts of plaintiff's claims, as shown by this response and its supporting exhibits and affidavits. The requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).*

There is sufficient evidence favoring the Plaintiff for a jury to return a verdict for the Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986). The evidence is sufficiently probative; therefore summary judgment cannot be granted in this case. *Id.* The issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson* at 251-252.

1.  Defendants, as movants, cannot rely on conclusory statements to establish that plaintiff has not presented evidence on an essential element. Rather, Defendant must demonstrate an absence of a genuine factual dispute. *Celotex,* 411 U.S. at 327. Only if Defendant meets its burden is Plaintiff required to respond by summary judgment proof to show a genuine issue of material fact.

2.  The Defendants have failed to present or designate evidence that negates or disproves, "the existence of any essential element of the opposing party's claim." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). Even assuming the Defendant's motion is properly supported, the Plaintiff has come forward with sufficient evidence to demonstrate a "genuine issue(s) for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

3.  Plaintiff defeats the Defendants' Motion for Summary Judgment. The Plaintiff has brought to the Court's attention evidence, discussed *infra*, sufficient to

6

establish a genuine issue of material fact as to each material element on which the Plaintiff would bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The dispute concerning the material facts is genuine and sufficient to overcome a summary judgment motion "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106. The Plaintiff's evidence is not merely colorable; it is significantly probative.

4.     As stated *supra*, Defendant has presented information in its Motion for Summary Judgment that is defective, untrue, and is misleading to this honorable court in an effort to avoid a trial before a jury of the Plaintiff's peers.

5.     A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Industrial Crafting Co., 358 F.3d 241, 247 (3d Cir.2004)(citing Anderson, 477 U.S. at 255).*

## POINT II

## PLAINTIFF WAS WRONGLY DISCRIMINATED AGAINST AS A PERSON WITH A PERCEIVED DISABILITY.  DEFENDANT'S ARTICULATED REASONS ARE NOT LEGITIMATE    .

### Plaintiff Establishes a *Prima Facie* Case of Discrimination.

Plaintiff has asserted claims under the *ADA and the NJLAD* for non-selection as a Morristown Police Officer. After the establishment of a prima facie case and the production of a legitimate, non-discriminatory rationale for action by the defendants, "a plaintiff may then survive summary judgment by submitting evidence from which a reasonable fact finder could reasonably either 1) disbelieve the employer's articulated

7

Jeff Terry (Pl.Ex. Q, 85:3-9).   Demnitz stated he had two reasons for non-selecting Jeff
Terry, one major and one minor.

> a). The <u>major reason</u> was: Jeff Terry worked as a bouncer in his previous
> employment.
>
> b). The <u>minor reason</u> was: Jeff Terry often rolls up his shirt sleeves to
> reveal his biceps.  Demnitz clarified that these were the reasons for his
> non-selection. (PL.Ex. Q, p.84:6-22 thru 85:13)

These are merely a pretext for unlawful discrimination. *See Reeves v. Sanderson
Plumbing Products Inc.*, 120 S.Ct. 2097 (2000).

Foremost, the employer's articulated reason for non-selecting the employee is
weak, implausible, inconsistent, contradictory, in that the following was determined in
discovery:

1. Plaintiff has previously "passed" several psychological testing for positions as Corrections
   Officer, NJ Department of Corrections; Communications Officer, Morristown Police
   Department (Pl.Ex. D) Pl.Ex.V, 19:11-23).   Further, Plaintiff passed a psychological test to
   become a Morristown Police Department officer when Carol Williams was Chief of the
   Department (PL.Ex. D; Pl.Ex. V, 19:11-23).

2. Bobbi Stanton, Defendant Demnitz's Secretary, testified that Chief Demnitz faxed over
   derogatory information to IFP from June 28, 2004 interview panel, particularly unlicensed
   Mathew Guller (Pl.V, 16:13-25 thru 17:22.  The information was from a June 28, 2004
   interview panel, not the December 14, 2004 panel (Pl.Ex. J).  Then Chief Demnitz also called
   Mathew Guller to insure Jeff Terry would fail the psychological examination (Pl.Ex. V, 21:20
   thru 22:25).  Chief Demnitz did not do this for the other candidates. (PL.Ex. V, Id).

3. Officers Rispoli & Captain Kruse testified that they had been arrested in assault related issues
   prior to joining the force.  These issues of physical assault never disqualified these
   individuals (Pl.Ex. S, 33:19 thru 34:15 and Pl.Ex. R, 24:20 thru 25:7)

4. The following police officers failed a psychological screen, yet were brought onto the police force: Karl Peter Demnitz, Bruce Summers, James Lonergan, John Elia (Pl.Ex. R, 42:14 thru 45:1).

5. Chief Demnitz himself had been a bouncer at "Society Hill" (Pl.Ex R, 34:11-25). Defendant Karl Peter Demnitz, Police Chief was a bouncer and a doorman at drinking establishments, which apparently has had little or no impact on Defendant's Demnitz ability to perform his job function. (Pl.Ex.Q 14:19-25 and 15:1-8). This is another genuine issue of material fact.

In an obvious attempt to overstate the danger of selecting the Plaintiff, the defendants cite *Spades v. City of Walnut Ridge, Arkansas, 186 F.3d 897, 900 (8th Cir.1999)* which stands for the proposition that increased potential liability associated with an employee's past activities is a legitimate concern, particularly when there is known violent behavior (Def.Brief, p.17). In the instant matter, Plaintiff Terry has never been involved in violent behavior. In fact, current employees Rispoli and Kruse were arrested for physical assault prior to their employment with the Defendant (Pl.Ex. S, 33:19 thru 34:15 and Pl.Ex. R, 24:20 thru 25:7). Moreover, several employees had failed psychological screens prior and during their employment with Morristown Police Department (Pl.Ex. R, 42:14 thru 45:1) Captain Kruse testified he thought Jeff Terry would be a very good Police Officer and that he thought he might be judging Jeffrey Terry too harshly (Pl.Ex. R, 45:21 thru 46:13). The concern that Jeffrey Terry was aggressive was based on rumors (Pl.Ex. R, 64:7-15). Defendant never mentions that Plaintiff Terry passed the psychological screen to become a Police Officer in Morristown in 2002, but that then Police Chief Carol Williams believed he needed more seasoning. Nothing occurred between 2002 and 2004 in which could be interpreted as "a psychological event" which would prevent Jeff Terry from becoming a Police Officer. (Pl.Ex. V, 21:20 thru 22:25). Lastly, . Defendant Chief Demnitz issued a gun permit to Jeff Terry on May 9, 2008 (Pl.Ex. Z). Chief Demnitz obviously was not concerned about Plaintiff endangering anyone.

Defendant's proffered reasons are unbelievable, to wit:

legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Shaner v. Synthes, 204 F.3d 494, 503 (3dCir.2000)(ADA); Waldron v. SL Indus., Inc., 56 F.3d 491, 503 (3d Cir. 1995) (applying Third Cir. Pretext Rule under the NJLAD).*

This is a case of dueling psychological reports: one dated December 28, 2004 which states that Plaintiff is psychological fit for duty as a police officer (Pl.Ex. N, Rossi Report), and one dated January 7, 2006 (12 months later) which determined that Plaintiff was unfit to serve as a police officer (Pl.Ex. O, Kanen's report).

Under the McDonnell Douglas line of cases, as applied to the ADA and NJLAD, there is a three step burden shifting process in the analysis of pretext discrimination cases. *See McDonnell Douglas Corp., v. Green, 411 U.S. 792, 802-04 (1973).* First the Plaintiff must establish a *prima facie* case of discrimination. With regard to the ADA/Rehabilitation Act, plaintiff must show that he (1) is a member of a protected class (Plaintiff was perceived to have psychological disability (Pl.Ex. L and Pl.Ex. O), and (2) is qualified for the position (offered the position Pl.Ex. I offer of employment), (3) suffered an adverse employment decision (nonselection) (Pl.Ex. L), and (4) in the case of a hiring the employer continued to hire applicants for the position (Defendant hired several individuals listed after Plaintiff on the Certification List, Pl.Ex. E: including Mr. Tissot, Mr. Hudson, Mr. Sylvin, Mr. Bergman). *See Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61,68 (3d Cir.1996); Sempier v. Johnson & Higgins, 45 F.3d 724,728 (3d Cir.1995); Chipollini v. Spencer Gifts, Inc. 814 F.2d 893,897 (3d Cir.1987).*

## A.       Defendant's Actions Are Pretext.
## Defendants' Articulated Reasons for Their Actions are Pretextual.

Defendants make it clear that the articulated legitimate reasons for their action of in treating Plaintiff was based on the following: Defendant Demnitz's testified in his deposition that **he was** the "Selecting Official." He made the final decision not to hire

8

Plaintiff held the *de facto* number one (1) position on the eligibility list as candidate for the position of Police Officer.1 As such, he was required to undergo a background psychological testing. Defendant, Town of Morristown, provided Institute of Forensic

Psychology (IFP) the **Legal Structure on a Non-Selection**:

- In a non-selection, Title I of the Americans with Disabilities Act (ADA)
  - Title I of the ADA prohibits private employers and state and local governments from discriminating against qualified individuals with disabilities on the basis of their disabilities.
  - The ADA specifies when an employer may require an applicant or employee to undergo a medical examination, *i.e.*, a procedure or test that seeks information about an individual's physical or mental impairments or health. The ADA also specifies when an employer may make "disability-related inquiries," *i.e.*, inquiries that are likely to elicit information about a disability.
    - When hiring, an employer may not ask questions about disability or require medical examinations until **after** it makes a conditional job offer to the applicant. 42 U.S.C. §12112 (d)(2) (Pl.Ex. I);
    - After making a job offer (but before the person starts working), an employer may ask disability-related questions and conduct medical examinations as long as it does so for **all individuals entering the same job category.** *Id.* at § 12112(d)(3) Defendant Demnits did not fax derogatory material to IFP for all candidates (PL. Ex. V, 21:20 thru 22:25); and
    - With respect to **employees**, an employer may ask questions about disability or require medical examinations only if doing so is **job-related and consistent with business necessity.** Thus, for example, an employer could request medical information when it has a **reasonable belief**, based on **objective evidence**, that a particular employee will be unable to perform essential job functions or will pose a direct threat because of a medical condition, or when an employer receives a request for a **reasonable accommodation** and the person's disability and/or need for accommodation is not obvious. *Id.* at § 12112(d)(4). This does not apply to the criteria that: he rolls his sleeves on his shirts, or that he once worked as a bouncer (Pl.Ex. Q, 84:6-22 thru 85:13)
  - The ADA also makes it unlawful to:

- Use employment tests that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the test, as used by the employer, is shown to be job-related and consistent with business necessity. 42 U.S.C. § 12112(b)(6); Can we state with credulity that having been diagnosed with ADD at age 10, in the 5th Grade, has any impact on a person's ability to perform as a Police Officer nearly twenty years later? (Pl.Ex.O).

- Fail to select and administer employment tests in the most effective manner to ensure that test results accurately reflect the skills, aptitude or whatever other factor that such test purports to measure, rather than reflecting an applicant's or employee's impairment. *Id.* at § 12112(b)(7), i.e. you cannot fax derogatory material to the psychological professional; and

- Fail to make reasonable accommodations, including in the administration of tests, to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such accommodation would impose an undue hardship. *Id.* at § 12112(b)(5). Defendants could have sent Plaintiff Terry to the 20 week police academy, and 14 week in field training in order to see if he could withstand the psychological requirements.

Under the *Rehabilitation Act* "every kind of disadvantage resulting from. . . prejudice in the employment is outlawed. Forcing a plaintiff to be considered for promotion in a process in which [an impermissible factor] plays a discernable part is itself a violation of the law, regardless of the outcome of the process. At the very least, such a process "[t]ends to deprive" him of an employment opportunity." *Bibbs v. Black, 778 F.2d 1318 at 1322* citing 703(a)(2) of the Rehabilitation Act.

Contract to supply psychological testing of candidates for employment.

Plaintiff was interviewed, tested and examined at the Institute of Forensic Psychology (herein after, IFP) by an unlicensed and unqualified psychologist, Matthew Guller (Pl.Ex. K). The State admonished and penalized Guller for his actions (Pl.Ex. K). Unlicensed psychologist, Mr. Guller, alleged in his examination that Plaintiff did not meet psychological standards for the position of Police Officer. Guller did not provide any substantial evidence or documentation to provide for Plaintiff's alleged disability. It has become apparent that Defendant Karl Peter Demnitz, Chief of Police, telephoned and faxed derogatory information to Matthew Guller to insure plaintiff would not be eligible.

12

Chief of Police Secretary Bobbi Stanton testified at her deposition that Chief Pete Demnitz did this only for Jeffrey Terry (PL.Ex. V, 16:13-25 and 17:1-23).

This confidential, psychological examination was conveyed to Chief Demnitz who removed Plaintiff effective February 22, 2005, from the eligibility list of Police Officer candidate. Also, Defendant Police Chief Karl Peter Demnitz, of the Morristown Police Department, advised Plaintiff that he would not be attending the Police Academy on January 10, 2005.

However, a January 3, 2005 report reflected, Plaintiff, Jeffrey Terry, had been psychologically examined by Dr. Bart Rossi, Ph.D, *Diplomate*, on December 28, 2004 and found to be eligible for the position as Police Officer candidate. Dr. Rossi recommended Mr. Terry for the position and advised he would be "a fine addition" to any local Police Department. Dr. Rossi also stated that Plaintiff had the potential to make a positive contribution in the position sought and should be hired (Pl.Ex. N).

According to the Americans with Disabilities Act (ADA), *42 U.S.C. § 12101, et seq.*, the decision made by Town of Morristown and Morristown Police Department was inconsistent under the ADA. In Plaintiff's psychological evaluation administered by Dr. Bart Rossi on December 28, 2004, it was stated that Plaintiff will have no problems intellectually or cognitively performing his duties as a Police Officer. Also, Plaintiff's character does not indicate any major psychological problems or issues (PL.Ex.N).

Plaintiff was treated and perceived by Defendant as though he had a disability. Plaintiff was removed by Defendant from the eligibility list without detailed consideration and research. Defendant did not provide a legitimate and substantiated reason as to why Plaintiff could not complete the basic Police Academy training course while accommodating the alleged disability.

In accordance with the Americans with Disabilities Act (ADA) 42 U.S.C. § 12101, et seq, and Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq, section 504, it is

13

stated that short term and potential problems do not count as disabilities. Therefore, under ADA, Plaintiff does not qualify under any state to be impaired or disabled to perform assigned duties as Police Officer-although he was perceived as such. Mr. Terry does not possess any impairment that would substantially limit his ability to work, although he was treated as such.

In *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 725 the Supreme Court responded in stating that "a disability exists only where impairment substantially limits a major life activity, not where it 'might', 'could', or 'would' be substantially limiting if mitigating measures were not taken." Therefore, through Dr. Bart Rossi's psychological examination, it is apparent that Plaintiff, Mr. Terry does not posses any such impairment that would limit his life activities. Further, Jeffrey Terry's aggression only appeared to be rumored and not an intrinsic to him personally (Pl.Ex. R, 64:7-15).

Defendant followed a policy and practice of discrimination against the Plaintiff, in violation of the Americans With Disabilities Act (ADA) 42 U.S.C. § 12101, et seq.. Rehabilitation Act of 1973 29 U.S.C. § 701, et seq., and the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1, et seq.. Defendant treated Plaintiff as if he had a disability, but yet never provided what job requirements he could not fulfill or whether he could perform the duties of a Police Officer. Defendant relied on an evaluation that was provided by an unlicensed psychologist who did not provide valid reasoning for Plaintiff's alleged disability (Pl.Ex. L). This action is in violation with the above referenced statutes.

### POINT III

I.    **Statutory Provisions Mandating the Blanket Exclusion From Employment of All Persons With Any "Apparent Mental Disorder" Listed in the DSM and N.J.A.C. 4A:4-6.1(a)(3) Are Facially Invalid Under the ADA**

The Defendant's position that Dr. Kanen's report of January 2006, more than a

14

The Defendant's position that Dr. Kanen's report of January 2006, more than a year after Plaintiff was made a conditional offer of employment (Pl.Ex.O), is inconsistent with the law. To be lawful under the ADA, any employment qualification standard that screens out individuals with disabilities must be "job-related and consistent with business necessity." 42 U.S.C. §12112(b)(6).[1] This means that the standard must directly relate to the ability of an individual to perform the essential functions of the specific job to which the standard is being applied. However, if the qualification standard does not meet this test and is instead imposed for the purpose of excluding individuals who are thought to pose a threat to public health or safety, then the standard must be justified under the "direct threat" provision of the ADA. See 29 C.F.R. part 1630, App. §1630.15(b) & (c).

There is no question that the qualification standard at issue in this case screens out individuals with mental disabilities from employment as police officers[2], because it constitutes a blanket exclusion of all individuals with any mental disorder listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM), including many conditions that would qualify as "disabilities" under the ADA but do not necessarily impact a person's ability to perform the essential functions of the job with or without a reasonable accommodation. In the instant matter, Captain John Kruse advised that there wasn't anything in the official job description that Plaintiff Terry could not perform (Pl.Ex.R, 45:21 thru 46:13). There is also no question that the standard is imposed for the specific purpose of excluding certain individuals from employment as police officers because it is presumed that they will pose a threat to public health or safety, discussed *supra*.

---

[1] The burden is on the employer to produce evidence establishing that the standard meets these requirements in any given case. See Andrews v. Ohio, 104 F.3d 803, 807-808 (6th Cir. 1997).

Therefore, the validity of this qualification standard under the ADA depends on (a) whether it is job-related and consistent with business necessity, and (b) whether the entire class of individuals excluded by the standard necessarily pose a "direct threat."

### A.   The Blanket Exclusion Is Not Job-Related and Consistent with Business Necessity

The employment qualification standard at issue in this case categorically excludes an entire class of individuals on the basis of disability – every person with any "apparent mental disorder." See N.J.A.C. 4A:4-6.1(a)(3)  With respect to such "[qualification] standards that may exclude an entire class of individuals with disabilities," the EEOC has stated that

> "Blanket" exclusions of this kind usually have been established because employers believed them to be necessary for health or safety reasons...Employers who have such standards should review them carefully. In most cases, they will not meet ADA requirements[....]since generalized "blanket" exclusions of an entire group of people with a certain disability prevent [the] individual consideration [required by the ADA].

EEOC's Technical Assistance Manual on Title I of the ADA at §4.4 (emphasis added).[3] This interpretation is based upon and fully consistent with the ADA's legislative history, which makes clear that it is individualized assessment, and not blanket exclusions, that must be employed to determine whether an individual is qualified for employment in any given position:

> [The ADA] prohibits the use of a blanket rule excluding people with certain disabilities except in the very limited situation where in all cases [a] physical [or mental] condition by its very nature would prevent the person with a disability from performing the essential functions of the job, even with reasonable accommodation.

S. Rep. No. 116, 101st Cong., 1st Sess. 27 (1989) (Senate Report) (emphasis added).

Consistent with Congress' intent as expressed in the ADA, courts have struck

---

[3]  The EEOC's Technical Assistance Manual was issued on January 27, 1992, pursuant to express statutory directive. 42 U.S.C. §12206(c)(3).

down disability-based blanket exclusions such as the qualification standard at issue in this case, both in and out of the employment context. Courts have invalidated blanket exclusions in a numerous cases involving insulin-dependent diabetics, finding that "[t]he [ADA] makes it clear that blanket exclusions are to be given the utmost scrutiny." *Bombrys v. City of Toledo, 849 F.Supp. 1210, 1220 (N.D. Ohio 1993). See, e.g., EEOC v. Chrysler Corp., 917 F.Supp. 1164 (E.D. Mich. 1996), rev'd on other grounds, 172 F.3d 48 (6th Cir. 1998); Sarsycki v. United Parcel Service, Inc., 862 F.Supp. 336 (W.D. Okl. 1994) (same).*[4]

The blanket exclusion at issue here is defined with specific reference to the DSM and N.J.A.C. 4A:4-6.1(a)(3), and thus its scope of coverage includes every "mental disorder" listed in the DSM. The DSM is intended to be comprehensive and exhaustive, cataloging and describing any and all conditions with which psychiatrists may diagnose an individual seeking psychiatric treatment, ranging from common afflictions such as mild depression or insomnia to more serious conditions such as bi-polar disorder and schizophrenia. Thus, the DSM includes many conditions that, while they may substantially limit one or more of an individual's major life activities and thus amount to "disabilities" under the ADA, do not necessarily impose any limitations at all on the

---

[4] Similar blanket employment policies have been found equally invalid under the ADA because they do not allow for a case-by-case assessment of an individual's ability to perform the essential functions of the job with or without a reasonable accommodation. For example, in Krocka v. Bransfield, 969 F.Supp. 1073, 1089 (N.D. Ill. 1997), the court held that a police department's mandatory policy of automatically placing officers taking Prozac under a special monitoring program violated the ADA. See also Heise v. Genuine Parts Co., 900 F.Supp. 1137, 1154 & n.10 (D. Minn. 1995) (holding that an employer's "100% healed" policy, in which injured employees were required to be completely free of any physical restrictions before they were permitted to return to work, was a per se violation of the ADA); Hutchinson v. United Parcel Service, 883 F.Supp. 379, 397 (N.D. Iowa 1995) (same); Hammer v. Board of Education of Arlington Heights School District No. 25, 955 F.Supp. 921, 927 (N.D. Ill. 1997) (finding a disputed question of fact as to whether the employer in fact had a "blanket policy," but noting that "a per se violation [of the ADA] is one in which an individual assessment of an individual's ability to perform the essential functions of the person's job with or without accommodation is not made by the employer.")

17

individual's ability to perform the essential functions of the position at issue.[5]  For example, the DSM-IV includes descriptions of certain sexual dysfunctions and eating disorders that could substantially affect a major life activity such as reproduction or eating but which have no effect whatsoever on an individual's ability to perform the duties of a police officer.

Blanket exclusions will rarely be job-related and consistent with business necessity.  *See, e.g., Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999)*;  As provided in the ADA, in order for any employment qualification standard to be considered "job-related and consistent with business necessity," it must relate to the "essential functions" of the specific job to which it is being applied and measure the individual's actual ability to perform those functions.  See 29 C.F.R. §1630.10, App.; EEOC Technical Assistance Manual for Title I of the ADA at §4.3.[6]  "It is not enough that [a standard] measures qualifications for a general class of jobs" – rather, to be job-related and consistent with business necessity, the standard must relate directly to the specific job for which the individual is being considered (Police Officer), and measure the individual's ability to

---

[5]  The DSM contains the following cautionary statement regarding its use outside of medical settings, which makes clear that diagnosis alone does not equate to an individualized assessment of what actual limitations, if any, are posed by any particular mental disorder;

[6]  "Essential functions" are the fundamental job duties of the position at issue, as distinguished from its marginal functions. 29 C.F.R. §1630.2(n).  They are the specific job tasks themselves, rather than the way the tasks are performed.  See, e.g., H.R. Rep. No. 485 part 2, 101st Cong., 2d Sess 54-55 (1990) (Labor Report) ("driving" or "typing" are "essential functions" if they are fundamental to a particular job); H.R. Rep. No. 485 part 3, 101st Cong., 2d Sess. 32 (1990) (Judiciary Report) ("essential function" of job requiring use of a computer "is the ability to access, input and retrieve information from the computer"); 29 C.F.R. part 1630, App. §1630.2(n) (examples of "essential functions" include operating a cash register for a cashier's job; carrying a person from a burning building for a firefighter; typing for a typist; and cleaning for a chambermaid). See also EEOC's Technical Assistance Manual for Title I of the ADA at §2.3(b) (examples of job functions that may be essential include filing, answering the telephone, or typing for clerical job; proofreading for a proofreader job; availability to work odd shifts for substitute "floating" supervisor; foreign language fluency for job selling products to foreign companies; landing a plane for pilot position).

perform the essential functions of that particular job.  Id. at §4.3(1) (emphasis added).[7]

Thus, in order to prevail on a claim that the blanket exclusion at issue in this case is job-

related and consistent with business necessity under the ADA, Defendants would have to

prove that the requirement that individuals "be free of all apparent mental disorders listed

in the DSM" directly relates to ability of such individuals to perform a specific, concrete

job function that is "essential" to the performance of all police officer positions in the

state.  Defendants cannot carry this burden.[8]  Instead, they "hang their hat" first on an

unlicensed psychologist's report (Pl.Ex.L) and then Kanen's report which took place 1

year after the conditional offer of employment in January 6, 2006 (Pl.Ex.O).


Moreover, Defendant's brief posed at page 20, "when an employee's termination

is based upon a recommendation of a physician . . ."  Then problem with this statement is

that Mathew Guller was not a licensed psychologist (never mind a physician) (Pl.Ex. K).

Later on page 21, Defendants aver, "Likewise, Plaintiff was not removed from the

eligible list because he was perceived to have a disability, but rather, because he was

found medically unqualified by Dr. Guller and later Dr. Kanen." (Def. Brief, p.21),  The

---

[7] See Senate Report at 36-37 (qualification standards that screen out an individual or class of individuals "because of a disability...must concern an essential, non-marginal aspect of the job, and be carefully tailored to measure the person's actual ability to do this essential function of the job"); Labor Report at 70-71; see also Judiciary Report at 42 ("[t]he requirement that job selection procedures be job-related and consistent with business necessity underscores the need to examine all selection criteria to assure that they...provide an accurate measure of an applicant's actual ability to perform the job."); see also Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 698-99 (7th Cir. 1998) (finding "most troubling" the possibility that an employer may have imposed a "separate criterion of 'physical fitness' – unrelated to job requirements – as a qualification standard for promotions, layoffs and recalls [because it would] tend[] to screen out, whether intentionally or unintentionally, disabled employees," and thus "violat[e] the ADA's requirement of an individualized assessment of an employee's capabilities.")

[8] Even in cases where a qualification standard would be job-related and consistent with business necessity, employers are still prohibited from invoking the standard to deny a job to an individual with a disability unless they can show that no reasonable accommodation is available that would allow the individual to perform the job.  See 42 U.S.C. §12113(a).  By their nature, blanket exclusions are irreconcilable with this requirement, since they eliminate the individual from the pool before any reasonable accommodation can be considered.

fact Mathew Guller was not "**Dr. Guller**," (Pl.Ex. K) and that neither Guller nor Kanen were medical doctors (PL.Ex.L and Pl.Ex. O) who could make a determination should alert the court that Defendants are playing loose with the facts.

Defendants cannot show that the blanket exclusion directly measures skills required by the job of police officer or the actual ability of individuals to perform the essential functions of that position. In fact, by categorically excluding all individuals with any apparent mental disorder at any stage of employment, including those who have successfully worked as police officers for years, the standard requires employers to ignore the best evidence of the individual's actual ability to perform the functions of the police officer position. In fact several current and previous employees of the Morristown Police Department had failed a psychological screen (Pl.Ex. R, 42:14 thru 45:1) "Once an employee is on the job, the actual performance on the job is, of course, the best measure of his ability to do the job." Senate Report at 38; Labor Report at 74.[9] As stated herein, there are several police officers who had failed a psychological screen, yet performed successfully as police officer's, including the Defendant Demnitz. (Pl.Statement of Facts ¶60).

Rather than pertaining to a specific essential job function, the standard at issue in this case simply excludes an entire class of individuals with disabilities because they are presumed to pose a safety threat. Consequently, because the standard does not measure an individual's actual ability to perform the essential functions of the job of police

---

[9] See, e.g., Prewitt v. United States Postal Service, 662 F.2d 292, 309 (5th Cir. 1981) (holding in a case brought under the Rehabilitation Act that the plaintiff, who had satisfactorily performed the job of postal worker in the past despite his disability, had "raised a genuine issue of material fact as to whether the postal service's physical standards for employment are sufficiently 'job related' to justify the employer's refusal to hire him" for the position).

officer, it is not job-related and consistent with business necessity.[10]  Thus, the only way

for Defendants to establish that this qualification standard is lawful under the ADA is to

prove that it meets the ADA's criteria for a qualification standard that excludes

individuals who pose a direct threat.  In the instant matter,  Officer Rispoli and Captain

Kruse had been arrested for physical assault prior to becoming police officers-yet this

never disqualified them from employment. (Pl.Statement of Facts ¶56)

**B.      The Blanket Exclusion Cannot Be Justified Under the "Direct Threat" Provision**

In the instant matter, Defendant Chief Demnitz issued a gun permit to Jeff Terry

on May 9, 2008 (Pl.Ex. Z).  Chief Demnitz obviously was not concerned about Plaintiff

endangering anyone.  Likewise, Chief Peter Demnitz testified he has never fired his

weapon in 26 + years as an Officer for the Morristown Police Department, nor did any of

the other officers deposed (Pl.Ex Q, 128:12-17). As shown, this employment

qualification standard does not measure the ability of individuals to perform the essential

functions of the position of police officer; instead, it presumes the inability of an entire

class of individuals to perform those functions safely.  As such, it falls into the category

of qualification standards that exclude categories of individuals that, regardless of their

skills or abilities, are deemed to pose an unacceptable safety risk.  Although such

standards are not always unjustified, they are significantly more susceptible to employer

speculation and stereotyping on the basis of disability – precisely what the ADA was

intended to prohibit.  Because such standards are imposed for the purpose of protecting

public health and safety, they are only valid under the ADA if they qualify under its

express provision regarding safety standards imposed for this purpose – the "direct

threat" provision.  See 42 U.S.C. §12113(b); see also Judiciary Report at 486 ("If the

[individual] is otherwise qualified for the job, he or she cannot be disqualified on the

basis of a physical or mental condition unless the employer can demonstrate that the

[individual's] disability poses a direct threat to others in the workplace.")

---

[10] Although a given qualification standard may be so unrelated to the job to which it applies that it may be found to be not job-related and consistent with business necessity as a matter of law, the reverse is not true.

For Defendants to justify this qualification standard under the direct threat provision, they bear the substantial burden of proving that any individual with any mental disorder listed in the DSM who applies for a job as a police officer will necessarily pose a "direct threat" to the health or safety of others – that is, a significant risk of substantial harm that cannot be reduced or eliminated by reasonable accommodation. 42 U.S.C. §12113(b). It is simply not sufficient for Defendants to make the conclusory assertion that the entire class of individuals who have any kind of mental disorder listed in the DSM may potentially pose a direct threat – they must demonstrate that this is in fact the case.[11] Given the overbreadth of the statutory provision – requiring the blanket exclusion of all individuals with "mental disorders" no matter whether they are diagnosed with insomnia or paranoid schizophrenia – this burden cannot possibly be met. As the Supreme Court observed in the seminal direct threat case, "[t]he fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding...*all* persons with actual or perceived contagious diseases." School Board of Nassau County v. Arline, 480 U.S. 273, 285 (1987).

First, to meet the "direct threat" standard, there must be a "significant" risk of substantial harm, and it cannot be either speculative or remote. In Bragdon v. Abbott, 524 U.S. 624 (1998), the U.S. Supreme Court discussed the origin of the ADA's "direct threat" provision:

> The ADA's direct threat provision stems from the recognition in [Arline] of the importance of prohibiting discrimination against individuals with disabilities while protecting others from significant health and safety risks...Because few, if any, activities

---

[11] In addition, even if a genuine significant risk of substantial harm were to exist in any given case, the employer would be required to consider whether the risk could be eliminated or reduced below the level of "direct threat" by reasonable accommodation. Again, except where it can be definitively established that no reasonable accommodation could ever be offered to allow any person subject to the exclusion to safely perform the essential functions of the job, blanket exclusions are clearly inconsistent with this requirement. 42 U.S.C. §12101(3).

> in life are risk-free, <u>Arline</u> and the ADA do not ask whether a risk <u>exists</u>, but whether it is significant.

<u>Id.</u>, 524 U.S. at 649 (emphasis added, internal citations omitted).[12] The direct threat standard thus represents the balance struck by the Court in <u>Arline</u> and codified by Congress in the ADA, advancing the "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks." <u>Arline</u>, 480 U.S. at 287. It is precisely because persons with disabilities have long been excluded from jobs on the assumption that they may pose some greater risk of injury or accident that Congress saw fit to define as "significant" the level of risk an employer must show to justify disqualifying an individual whose disability poses a potential health or safety risk, 42 U.S.C. §12111(3).[13]

Secondly, the specific risk alleged must be <u>identified</u> and assessed on a case-by-case basis, based on objective medical or other factual evidence relating to the individual in question.[14] "Whether one is a direct threat is a complicated, fact-intensive question, not a question of law. To determine whether a particular individual performing a

---

[12] In <u>Bragdon</u>, the Supreme Court held that an individual doctor's unsupported belief that a patient's HIV status rendered her a health risk was not dispositive under the ADA. <u>id.</u>, 524 U.S. at 655. Instead, the determination whether an individual poses a direct threat to the safety of others "must be based on medical or other objective evidence." <u>Id.</u>, 524 U.S, at 649. In <u>Arline</u>, the Court had held that a teacher with tuberculosis would not be qualified for her position only if she posed a "significant risk to others in the workplace." <u>Id.</u>, 480 U.S. at 287.

[13] <u>See also Arline</u>, 480 U.S. at 287 (the determination whether a person with a disability is "qualified" requires an "individualized inquiry" based upon "appropriate findings of fact," not upon "prejudice, stereotypes, or unfounded fear");

[14] This is also fully supported by the legislative history of the ADA. <u>See, e.g.,</u> House Report at 56-57 (quoting <u>Hall v. U.S. Postal Service</u>, 857 F.2d 1073, 1079 (6th Cir. 1988), additional citations omitted) (direct threat determination "requires a fact-specific individualized inquiry resulting in a 'well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives'"); and Senate Report at 27 ("determination that an individual with a disability will pose a direct threat to others must be made on a case-by-case basis and not be based on generalizations, misperceptions, ignorance, irrational fears, patronizing attitudes, or pernicious mythologies").

23

particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all the evidence about the nature of the risk and the potential harm." *Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 764 (5th Cir. 1996) ("Rizzo I").*[15]

•

As seen here, the Defendants performed no individual assessment of what Plaintiff Terry could or could not perform as a Police Officer. However, when Captain John Kruse was posed with the Position Description of a Police Officer, he believed Jeffrey Terry would make a fine police officer. (Pl.Ex. R, 45:21 thru 46:13).

## POINT IV.  DEFAMATION.

Plaintiff's claim of defamation is actionable as 1). there was a false and defamatory statement concerning the Plaintiff, i.e. that he was psychologically unfit and that is why he was not selected for the position; 2) an unpriviledged communication by the defendant Town of Morristown to a third party (Officer Brisco) who actually heard and understood the communication related to Jeffrey M. Terry (Pl.Ex. U, 42:15 thru 43:2); 3) there was fault at least to negligence on the part of the publisher. The Defendant town allowed information to be dispersed, as there was not a very good confidential or privacy program (Pl.Ex. V 36:6-10); and 4). Plaintiff Terry lost material and monetary value because of the dispersal of the false and defamatory statement. (Pl.Ex. F)  Plaintiff did not authorize the Town of Morristown to release information to any third party regarding his psychological evaluation, especially not the false report rendered by the unlicensed Mathew Guller (Pl.Ex. K and Pl.Ex. L). Defendant, however, released the results of the plaintiff's psychological evaluation to several non-management employees, including Office Briscoe, a member of the Morristown Police Department. Officer Briscoe disseminated this information throughout the entire Department. This

•

24

violation of the Act was intentional and had an adverse effect on the plaintiff.
Employees of the Defendant made offensive and derogatory statements about the plaintiff
that were exaggerated and/or fabricated. The plaintiff's reputation throughout the Town
of Morristown and the Morristown Police Department was severely diminished.

Further, Defendant released private information about the plaintiff to third parties.
These third parties had no right to this information, nor was prior written consent
received from the plaintiff. Defendant committed the common law tort of invasion of
privacy against the plaintiff. Additionally, the Defendant and its employees did and
continue to make defamatory statements about the Plaintiff that are false. Those false
statements and documents are published to third parties, and Plaintiff continues to be
harmed by such defamatory statements. *Printing Mart-Morristown v. Sharp Electronics,
116 N.J. 739, 768 (1989)*.

## POINT V. <u>DEMNITZ'S INDIVIDUAL LIABILITY UNDER NJLAD</u>

The final remaining issue is whether or not Demnitz may be individually liable
for violation under NJLAD.   Police Chief Karl Peter Demnitz himself claimed under
oath that he made the decision to non-select Plaintiff Terry (Pl.Ex. Q p.84:6-22 thru
85:13) . Yet, the Defendants' attorney claim Town of Morristown made the decision.
Demnitz alone called the unlicensed Mathew Guller prior to Terry's psychological
session (PL.Ex, V, 21:20 thru 22:25).  Chief Demnitz did not do this for the other
candidates. (PL.Ex. V, *Id*).  Defendant Demnitz alone decided to fax interview questions
and comments from June 28, 2004 (not the December 14, 2004 interview) which was not
done for any other candidiate (PL.Ex. V, 16:13-25 thru 17:22).

The NJLAD provides for individual liability for employers and aiding and
abetting liability for "all persons," *Cicchetti v. Morris County Sheriff's Office, 947 A.2d
626, 645 (N.J. 2008)*.  With respect to "aiding and abetting," the New Jersey Supreme
Court recently stated that "individual liability of a supervisor for acts of discrimination or

for creating a hostile work environment can only arise through the "aiding and abetting" mechanism that applies to "any person." *Cicchetti, 947 A.2d at 645.*

Here, Demnitz was an aider and abetter, can be held personally liable, as it was his actions-of relying on the unlicensed Mathew Guller's report, faxing negative and June 28, 2004 (old) information on Candidate Terry to unlicensed Guller's office, as well as calling unlicensed Mathew Guller's office (PL.Ex. V, ). All these actions were taken to insure that Jeffrey M. Terry would not be selected as a Morristown Police Officer. Cicchetti at 645. Demnitz is liable under the NJLAD statute for aiding and abetting.

## Privacy Act & HIPAA.

In light of judicial economy, plaintiff moves to dismiss his claims of violations of the *Privacy Act, 5 U.S.C. §556, and HIPAA* as state and local governments are not covered by the Privacy Act.

## VI. CONCLUSION

Genuine issues of material fact exist. Plaintiff has carried such a burden.

The Plaintiff has demonstrated such "weakness implausibility, inconsistencies, incoherencies, or contradiction in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non discriminatory reasons." *Brewer v. Quaker Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir.1995), *quoting Fuentes,* 32 F.3d at 765.

The court must construe the facts in the light most favorable to the Plaintiff. The Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

**CRESCI LAW FIRM LLC**
830 Avenue A, PO Box 74
Bayonne, New Jersey 07002
Telephone:     (201) 436-4126
Telecopier:     (201) 436-9220

By:__*Peter J. Cresci, Esq. /s/*___

    **PETER J. CRESCI, ESQ. (PC7693)**
    Attorney for the Plaintiff